FILED
United States Court of Appeals
Tenth Circuit

December 7, 2007

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

VIA CHRISTI REGIONAL
MEDICAL CENTER, INC., successor-
in-interest to St. Joseph Medical
Center, Inc.,

      Plaintiff-Appellant,

v.

MICHAEL O. LEAVITT, Secretary of
Health and Human Services,

      Defendant-Appellee.

No. 06-3402

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 04-CV-1026-WEB)

---

Robert E. Mazer, Ober, Kaler, Grimes & Shriver, Baltimore, Maryland (Stephen
E. Robison and Lyndon W. Vix, Fleeson, Gooing, Coulson & Kitch, LLC,
Wichita, Kansas; Robert L. Heath, Via Christri Health System, Inc., Wichita,
Kansas, with him on the briefs), for Plaintiff-Appellant.

Joel McElvain, United States Department of Justice, Civil Division, Washington,
D.C., (Peter D. Keisler, Acting Attorney General; Eric F. Melgren, United States
Attorney, State of Kansas, Kansas City, Kansas; Michael Raab, United States
Department of Justice, Civil Division, Washington D.C.; Daniel Meron, General
Counsel, Kathleen H. McGuan, Associate General Counsel, Mark D. Polston,
Deputy Associate General Counsel for Litigation, David Hoskins, Attorney,
Office of the General Counsel, U. S. Department of Health and Human Services,
of Counsel, with him on the brief), for Defendant-Appellee.

---

Before **KELLY, BALDOCK,** and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Via Christi Regional Medical Center, Inc. ("Via Christi") appeals the decision of the district court, which affirmed the denial of Via Christi's request for reimbursement for Medicare depreciation expenses by Michael O. Leavitt, the Secretary of Health and Human Services (the "Secretary"). Via Christi is the successor-in-interest to St. Joseph Medical Center, Inc. ("St. Joseph"), and Via Christi argues that the Secretary must reimburse it for a $9.7 million "loss" on the assets that it acquired as the surviving entity in a consolidation between St. Joseph and St. Francis Regional Medical Center ("St. Francis"). The Secretary and the district court denied Via Christi's claim for reimbursement on two grounds: first, the consolidation was between "related parties" under 42 C.F.R. §§ 413.134, .17; and second, no "bona fide sale" occurred under 42 C.F.R. § 413.134(f). We exercise jurisdiction under 28 U.S.C. § 1291, and although we conclude that the Secretary's "related party" interpretation contradicts the plain language of § 413.134, we affirm the Secretary's denial of reimbursement based on the "bona fide sale" requirement.

I.

*Statutory and Regulatory Framework*

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (2006), establishes the federally funded health insurance program for the aged and disabled, commonly known as Medicare. The Centers for Medicare and Medicaid Services ("CMS")[1] administers the Medicare program on behalf of the Secretary. In addition, the Secretary contracts out Medicare's payment and audit functions to fiscal intermediaries, who initially determine whether and how much to reimburse a provider of services for treatment under Medicare. See 42 U.S.C. § 1395h. If a provider is dissatisfied with the fiscal intermediary's decision, then the provider may obtain a hearing with the Provider Reimbursement Review Board ("PRRB"). Id. § 1395oo(a). The CMS Administrator, "at his or her discretion, may review any final decision of the [PRRB]," 42 C.F.R. § 405.1875(a)(1) (2006), and the CMS Administrator's decision becomes the final decision of the Secretary, see 42 U.S.C. § 1395oo(f). The provider may appeal an adverse decision in district court. See id.

Under 42 U.S.C. § 1395f(b)(1)(A), "[t]he amount paid to any provider of services" for treatment under Medicare is generally the "reasonable cost of such services." The statute defines "reasonable cost" as

_____

[1] CMS was formerly the Health Care Financing Administration ("HCFA").

3

the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services . . . .

Id. § 1395x(v)(1)(A).

The Secretary has promulgated a number of regulations for determining the "reasonable cost" of provider services. Among these is 42 C.F.R. § 413.130 (1995),[2] which addresses "capital-related costs":

(a) General rule. Capital-related costs and an allowance for return on equity are limited to the following:

(1) Net depreciation expense as determined under §§ 413.134, 413.144, and 413.149, adjusted by gains and losses realized from the disposal of depreciable assets under § 413.134(f).

More specifically, 42 C.F.R. § 413.134(a) allows reimbursement "for depreciation on buildings and equipment used in the provision of patient care . . . ." Under this reimbursement system, providers determine the "historical cost of the asset"—i.e. "the cost incurred by the present owner in acquiring the asset," id. § 413.134(b)(1)—and calculate the depreciation by "prorat[ing] over the estimated useful life of the asset," usually using the "straight-line method" of depreciation. Id. § 413.134(a)(2)-(3). Medicare reimburses the percentage of the depreciation

---

[2] The regulations at issue here have undergone substantial revision since 1995, when the consolidation occurred in the instant case. Thus, like the district court, we will refer only to the 1995 version of the Code of Federal Regulations, unless otherwise noted.

4

attributable to the service of Medicare beneficiaries.  See id. § 413.134(a).  Thus, as the asset depreciates during its estimated useful life, its "net book value"—i.e. "the depreciable basis used for the Medicare program . . . less depreciation recognized under the Medicare program," id. § 413.134(b)(9)—decreases for Medicare purposes.

Recognizing that the depreciation reimbursements only approximate the actual decline in an asset's value, 42 C.F.R. § 413.134(f)(1) requires an adjustment for certain "disposals" of depreciable assets.  The regulation provides:

> If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost.  The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs.  The amount of a loss to be included is limited to the undepreciated basis of the asset permitted under the program.  The treatment of the gain or loss depends upon the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section.

Id.  Section (f)(2) governs the "gains and losses realized from the bona fide sale or scrapping of depreciable assets."  If, in a "bona fide sale," a provider receives consideration worth less than the asset's net book value, the provider may claim a "loss" and receive reimbursement for Medicare's share of that loss.  See id. § 413.134(f)(2).  On the other hand, if the provider receives consideration worth more than the asset's net book value, the provider must reimburse Medicare for Medicare's share of that "gain."  See id.  Also, if the provider sells multiple assets "for a lump sum sale price," then § 413.134(f)(2)(iv) requires the provider

5

to "allocat[e] the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset . . . ." The ultimate result of § 413.134(f) is that, "if a gain or loss is realized from the disposition, reimbursement for depreciation [is] adjusted so that Medicare pays the actual cost the provider incurred in using the asset for patient care." Principles of Reimbursement for Provider Costs and for Services by Hospital-based Physicians, 44 Fed. Reg. 3,980, 3,980 (Jan. 19, 1979).[3]

In the merger and consolidation context, 42 C.F.R. § 413.134(*l*)[4]—entitled "Transactions involving a provider's capital stock"[5]—supplies an additional layer of complexity. Section 413.134(*l*)(2) addresses "statutory mergers," where "two or more corporations [combine] under the corporation laws of the State, with one of the corporations surviving," and "[t]he surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law." It provides:

> (i) *Statutory merger between unrelated parties.* If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance

---

[3] Section 413.134(f) now prohibits the recognition of a gain or loss "on either the sale or the scrapping of an asset that occurs on or after December 1, 1997." 42 C.F.R. § 413.134(f)(1) (2006).

[4] Now 42 C.F.R. § 413.134(k) (2006).

[5] Despite the title of § 413.134(*l*), the Secretary has interpreted it as applying in the non-profit setting, where no "capital stock" is involved.

with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses. . . .

(ii) *Statutory merger between related parties.* If the statutory merger is between two or more related corporations (as specified in § 413.17), no revaluation of assets is permitted for those assets acquired by the surviving corporation. . . .

Id.  Section 413.134(*l*)(3) addresses "consolidations," the type of transaction at issue in the instant case.  It defines a "consolidation" as "the combination of two or more corporations resulting in the creation of a new corporate entity."  Id.  In such situations,

[i]f at least one of the original corporations is a provider, the effect of a consolidation upon Medicare reimbursement for the provider is as follows:

(i) *Consolidation between unrelated parties.* If the consolidation is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the provider corporation(s) may be revalued in accordance with paragraph (g) of this section.

(ii) *Consolidation between related parties.* If the consolidation is between two or more related corporations (as specified in § 413.17), no revaluation of provider assets is permitted.

Id.  In contrast to § 413.134(*l*)(2)(i), § 413.134(*l*)(3)(i) does not expressly state that the provider "is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses."  As we discuss below, however, the Secretary has interpreted § 413.134(*l*)(3)(i) to include a similar authorization for consolidations.

7

Both § 413.134(*l*)(2) and (*l*)(3) draw a distinction depending upon whether the merger or consolidation, respectively, is between related or unrelated parties. Also, both § 413.134(*l*)(2) and (*l*)(3) refer to § 413.17 for additional clarification. Section 413.17(b)(1) defines "related to the provider" to mean "that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies." In addition, § 413.17(b)(2) defines "common ownership" as "exist[ing] if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider." Finally, under § 413.17(b)(3), "[c]ontrol exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."

*The Secretary's Promulgation and Interpretation of 42 C.F.R. § 413.134*

In 1966, the Secretary issued the first regulations allowing for depreciation as an "allowable cost" and requiring that such calculations include "[g]ains and losses realized from the disposal of depreciable assets." Principles for Reimbursable Costs, 31 Fed. Reg. 14,808, 14,810-11 (Nov. 22, 1966). In 1977, amendments to those regulations permitted the revaluation of depreciable assets following a statutory merger between unrelated parties. See Establishment of Cost Basis on Purchase of Facility as an Ongoing Operation, and Transactions Involving Provider's Capital Stock, 42 Fed. Reg. 17,485, 17,486 (Apr. 1, 1977).

8

Those same amendments prohibited revaluation following any consolidation or a statutory merger between related parties. See id. In 1979, further amendments established the consolidation provisions at issue in the instant litigation. Principles of Reimbursement for Provider Costs and for Services by Hospital-Based Physicians, 44 Fed. Reg. 6,912, 6,915 (Feb. 5, 1979). The Secretary explained: "This rule also provides that assets may be revalued if two or more unrelated corporations consolidate to form a new corporation, but revaluation is not allowed if related corporations consolidate." Id. at 6,913. Other amendments in 1979 specified the treatment for certain types of "disposals" of depreciable assets, including "bona fide sales." See Principles of Reimbursement for Provider Costs and for Services by Hospital-based Physicians, 44 Fed. Reg. 3,980, 3,980-84 (Jan. 19, 1979).

In 1984, Congress added its own twist. In the Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 2314, 98 Stat. 494, 1079 (1984), Congress amended 42 U.S.C. § 1395x(v)(1)(O)(ii) (1988) to read: "Such regulations shall provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984."[6]

_____

[6] Ultimately, Congress eliminated this provision in the Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404(a), 111 Stat. 251, 400 (1997), and gave the Secretary greater freedom to address depreciation reimbursement. The Secretary responded by promulgating what is now 42 C.F.R. § 413.134(f)(1) (2006), which prohibits the recognition of a gain or loss "on either the sale or the scrapping of an asset that occurs on or after December 1, 1997." See supra note

(continued...)

9

In 1987, the Secretary issued two documents interpreting the consolidation provision. First, in the Medicare Intermediary Manual, 04-87, § 4502.7, ROA Vol. I, at 117-18, the Secretary explained that "Medicare program policy permits a revaluation of assets affected by corporate consolidations between unrelated parties." In such situations, "[a] gain/loss to the seller . . . and a revaluation of assets to the new provider . . . are computed." Id. Second, in a letter dated May 11, 1987, HCFA's Director of the Division of Payment and Reporting Policy, William Goeller, explained:

> Mergers and consolidations of nonstock, nonprofit providers may give rise to revaluations of assets . . . and/or adjustments to recognize realized gains and losses. Notwithstanding the reference to "capital stock" in the caption of regulations section 42 CFR 413.134[(l)] . . . , we look to that regulation for authority in addressing mergers and consolidations of nonstock issuing corporations because the principles involved would be the same. If the transaction you have described meets the definition of either a statutory merger or consolidation as set forth in the regulations section . . . , then a revaluation of assets and/or an adjustment to recognize realized gains and losses may occur.
>
> To determine whether a revaluation of assets or a gain/loss adjustment will occur, we must turn to the question of whether the assets will be donated or whether any consideration will be exchanged for the assets. . . .
>
> [I]f the assets will be exchanged for consideration, a donation would not occur and the consideration given would be the acquisition cost of the assets to the new owner. In a situation where the

[6](...continued)
3. Nevertheless, because both of these changes occurred after the consolidation in the instant case, the 1984 legislation and the 1995 version of § 413.134(f)(1) still govern here.

> surviving/new corporation assumes liability for outstanding debt of the merged/consolidated corporations, the assumed debt would be viewed as consideration given. Thus, in a merger or consolidation of nonstock, nonprofit corporations in which the surviving or new corporation assumes debt of the merged or consolidated corporations, . . . an adjustment to recognize any gain or loss to the merged/consolidated corporations would be required in accordance with regulations section 42 CFR 413.134(f). . . .

1987 Letter from William Goeller, ROA, Vol. I, at 135-36.

A memorandum dated January 11, 1989, from the Acting Director of the Bureau of Eligibility, Reimbursement and Coverage, explained that § 413.134(f)(2)'s "bona fide sale" requirement "means simply that the parties to the sale are not related within the meaning of regulations section 42 CFR 413.17 and PRM section 1000ff." Jan. 11, 1989, Memorandum, ROA, Vol. I, at 138. In a letter dated June 6, 1994, a consultant from Coopers & Lybrand asked Bruce Oliver, a Health Insurance Specialist with the HCFA, for "input as to the proper reimbursement implications regarding a proposed hospital consolidation involving two Medicare program participating providers." Letter from Coopers & Lybrand, ROA, Vol. I, at 177. At the heart of this inquiry was the question of whether the related party determination was based upon the relationship of the parties <u>before</u> or <u>after</u> the consolidation. The letter described the transaction as follows:

> The proposed transaction would involve the consolidation . . . of two unrelated hospitals to form a new corporate provider entity. The hospitals are not related parties within the meaning of 42 CFR 413.17 and PRM-I 1004. Both organizations are private not-for-profit corporations governed by separate boards of directors. There are no common board members between the two organizations, and no

11

common ownership or relationship currently exists. For
confidentiality purposes, we will refer to the current organizations as
Hospital A and Hospital B, and the new provider entity to be
established as Hospital C. . . .

Hospital A and Hospital B are clearly unrelated parties prior to the
proposed consolidation. However, Hospital C, the proposed new
corporate provider entity, will be governed by a board of directors
made up of six members from the existing governing board of
Hospital A, and six members from the existing governing board of
Hospital B. Accordingly, Hospital C may be considered to be related
to Hospitals A & B. To answer the question as to whether the related
party determination is made based on the relationship of the parties
before or after the consolidation, we have referred to the
Intermediary Manual Section 4502.7. The example given states only
that the two corporations were unrelated prior to consolidation. The
example concludes that the consolidation between parties unrelated
prior to the consolidation constituted a change of ownership for
Medicare reimbursement purposes with a gain/loss to the original
provider corporation(s) and a revaluation of the acquired assets to the
new corporate provider entity computed.

Each party to the consolidation prior to the consolidation are
unrelated and therefore the consolidation (acquisition) is "bona fide"
. . . .

Id. at 177-78. On August 24, 1994, Charles Booth, the Director of the Office of

Payment Policy, responded to the inquiry: "[W]e agree, based on our

understanding of the transaction, that it appears to be a consolidation as defined

in § 413.134[(*l*)](3)(i) requiring a determination of gain or loss under § 413.134(f)

. . . ." 1994 Letter from Charles Booth, ROA, Vol. I, at 175.

On April 18, 1995, the same consultant, Coopers & Lybrand, while

advising the providers in the instant case,[7] met with Bruce Oliver at the Central Office of the HCFA. Mr. Oliver did not agree with the letter from Charles Booth. Rather, Mr. Oliver believed that the "related party" determination required comparing Hospital C's board of directors with the boards of directors of Hospitals A and B. If the board of directors of Hospital A or B had significant influence or control over Hospital C, then he considered Hospital A or B to be related to Hospital C. He did not quantify what percentage of the board of Hospital C would have to come from the board of Hospitals A or B before Hospitals A or B would be viewed as related to Hospital C, but he speculated that if one-third of the board of Hospital C had the board of Hospital A or B as its source, then that would suffice.

Around the same time, the HCFA became increasingly concerned about the rising number of claims for reimbursement following change-of-ownership ("CHOW") transactions. In October 1994, it established a CHOW Workgroup to "[r]eview existing regulations and program manual provisions . . . regarding proper treatment of change of ownership transactions to determine appropriate Medicare reimbursement." Letter from Arlen Mieras, ROA, Vol. I, at 361. In November 1995, an Associate Regional Administrator in the Boston Regional Office requested advice from HCFA's Director of the Bureau of Policy Development, regarding whether the agency could deny a claim for

---

[7] Coopers & Lybrand made the previous inquiry on behalf of another client.

13

reimbursement where the board members of two consolidating hospitals "were/are essentially the same" as the board members of the new entity. Nov. 3, 1995, Memorandum, ROA, Vol. I, at 344. In March 1996, the Director of the Division of Payment and Reporting Policy responded, agreeing that "the facts and circumstances would support a finding of relatedness on the basis that the [board] of the consolidated entity . . . is comprised of a significant number of members of the [boards] of the non-surviving entities . . . .," and as a result, Medicare would not reimburse the consolidated entity for the alleged "loss" on the depreciable assets it had acquired. Letter from Stephanie Crowley, ROA, Vol. I, at 346. At the end of the correspondence, the Director agreed with the recommendation "to revise the regulations and manual instructions to include additional instructions regarding consolidations and mergers," but until that could be done, the HCFA was "notifying all regions by copy of this memorandum." Id. at 347.

On September 30, 1996, the CHOW Workgroup completed its analysis and recommended several changes to the Provider Reimbursement Manual ("P.R.M."). Specifically, the Workgroup recommended adding the following language: "Where a consolidation occurs that involves a continuity of control between the nonsurviving entities and the new, consolidated entity, the consolidation would be deemed to be between related parties." CHOW Workgroup P.R.M. Draft, ROA, Vol. I, at 365. In addition, it recommended defining "bona fide sale" in the P.R.M. as follows: "A bona fide sale contemplates an arm's length transaction

14

between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest." Id. at 367.

In June 1997, the Office of Inspector General ("OIG") of the Department of Health and Human Services released a report showing that Medicare's payments for depreciation adjustment losses had increased considerably since 1990. See Dep't of Health & Human Servs., OIG, Medicare Losses on Hospital Sales 9 (June 1997), available at http://www.oig.hhs.gov/oei/reports/oei-03-96-00170.pdf. The OIG recommended proposing legislation "to eliminate the requirement that Medicare make adjustments for gains or losses when hospitals undergo changes of ownership," and the HCFA concurred. Id. at B-3.[8] The OIG also noted that the Medicare program's ten-year transition to a "capital-PPS" depreciation reimbursement system had effectively allowed some providers, after a change of ownership, to obtain duplicate reimbursement for certain depreciation expenses. See id. at 10-11.[9]

_____

[8] Ultimately, Congress passed such legislation, and the Secretary promulgated 42 C.F.R. § 413.134(f) (2006). See supra notes 3,6.

[9] "Capital-PPS" is the abbreviation for the capital prospective payment system. Under capital-PPS, implemented during a ten-year transition phase from 1991 to 2001, Medicare now reimburses most hospitals for capital costs prospectively, using "a predetermined payment amount per discharge" rather than the "reasonable cost" methodology. See 42 C.F.R. §§ 412.1, 412.304 (2006). As
(continued...)

15

Finally, the HCFA issued Program Memorandum ("PM") A-00-76,

available at http://www.cms.hhs.gov/transmittals/downloads/A0076.PDF, in

October 2000, purporting to "clarify" the treatment of mergers and consolidations

of non-profit providers. It explained that "the merger or consolidation must occur

between or among parties that are not related as described in the regulations at 42

CFR 413.17 and the transaction must involve one of the events described in 42

CFR 413.134(f) as triggering a gain or loss recognition by Medicare . . . ." Id. at

1. PM A-00-76 then noted that, because of the differences between non-profit

and for-profit providers, "certain special considerations must be regarded in

applying [§ 413.134(*l*)] to non-profit mergers and consolidations." Id. at 2. It

explained:

_____

[9](...continued)
a result, although "the disposal of [a depreciable] asset may occur after the implementation of capital-PPS, a portion of the loss or gain may be attributable to cost years paid under reasonable costs and prior to the implementation of capital-PPS." CMS Decision, ROA, Vol. II, at 735. Even if a hospital under new ownership receives the capital-PPS rate per discharge, the previous owner, upon selling the hospital, will receive reimbursement for excess depreciation attributable to years before the implementation of capital-PPS.

For some hospitals during the transition period, Medicare initially calculated capital-PPS rates based upon the book value of the hospitals' depreciable assets at the time of the calculation. This rate did not change when a hospital changed ownership. Thus, upon selling a hospital to a new owner, the old owner obtained reimbursement for the "loss" incurred upon sale—supposedly representing additional depreciation under the "reasonable cost" reimbursement system. The new owner, however, would still, in effect, receive payment for these same depreciation expenses via the unchanged capital-PPS rate. See Dep't of Health & Human Servs., OIG, Medicare Losses on Hospital Sales 10-11 (June 1997). Today, with the full implementation of capital-PPS in 2001, this potential for double reimbursement is less likely. See id. at B-4 to -5.

16

In applying the related organizations principle at 42 CFR 413.17, consideration must be given to whether the composition of the new board of directors, or other governing body or management team, includes significant representation from the previous board(s) or management team(s).  If that is the case, no real change of control of the assets has occurred and no gain or loss may be recognized as a result of the transaction.  The fact that the parties are unrelated before the transaction does not bar a related organizations finding as a result of the transaction.

Id.  PM A-00-76 also addressed the "bona fide sale" requirement:

[N]o gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a bona fide sale as required by regulation 413.134(f) . . . .  The regulations at 42 CFR 413.134(l) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities' assets and liabilities without regard to whether a bona fide sale occurred. . . .

[F]or Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller.  An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining. . . .

As with for-profit entities, in evaluating whether a bona fide sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis.  As set forth in PRM 104.24, reasonable consideration is a required element of a bona fide sale.  Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a bona fide sale.

Id. at 3.  Moreover, "[b]ecause the sales price (assumed liabilities) is allocated first to the cash, cash equivalents, and other current assets," a transaction where the sale price is less than the value of the current assets is not a "bona fide sale."

17

Id. at 4 (Example 3). Because the PM claimed not to include any "new policies," it stated that it would apply "to all cost reports for which a final notice of program reimbursement has not been issued." Id. at 4.

*The Consolidation Between St. Joseph and St. Francis*

The basic facts of the underlying transaction are not in dispute. Prior to the consolidation at issue, St. Joseph was a non-profit corporation operating a 600-bed acute care hospital in Wichita, Kansas. St. Joseph's sole member was CSJ Health System of Wichita, Inc. ("CSJ"), and CSJ appointed the members of the nineteen-person board that governed St. Joseph. CSJ's sole member and religious sponsor was the Sisters of St. Joseph of Wichita ("Sisters of St. Joseph"), a religious order affiliated with the Catholic Church.

St. Francis was also a non-profit, operating an 850-bed hospital in Wichita. Its structure was similar to St. Joseph's: it had a single parent and sponsor—the St. Francis Ministry Corporation—whose sponsor was the Sisters of the Sorrowful Mother, another religious order affiliated with the Catholic Church. The only other major hospital in Wichita was the HCA Wesley Medical Center.

Prior to the consolidation, St. Joseph's long-term viability was in question. The primary insurer in the area, Blue Cross & Blue Shield of Kansas, Inc. ("Blue Cross"), intended to contract with only two of the three hospitals, and the rise of managed care was creating some financial pressure for St. Joseph. Accordingly, St. Joseph decided to attempt a consolidation, and it chose St. Francis as its

18

"logical partner" because of their shared affiliation with the Catholic Church, the potential for synergies, and the worry that a merger with the HCA Wesley Medical Center could create antitrust problems. At some point prior to the consolidation, St. Joseph became aware that a Medicare loss might result, but the potential of showing a Medicare loss was not a consideration in the decision to consolidate. The benefit of such a loss, moreover, would go to the new, consolidated entity. St. Joseph was not looking to get the full value for its assets, but rather to make a good decision for the advancement of its ministry. The principals of St. Joseph did not approach any other entity about a consolidation, and they rejected the idea of putting St. Joseph up for sale. They determined that such a sale would not have fulfilled their desire to perpetuate Catholic health care ministry in the community.

On September 28, 1995, St. Joseph and St. Francis executed a Master Plan of Consolidation, and the consolidation became effective on October 1, 1995. Prior to the consolidation, St. Joseph and St. Francis were not subject to common ownership or common control. After consolidation, the two organizations ceased to exist, and the new entity, Via Christi, assumed both corporations' assets and liabilities. See Kan. Stat. Ann. § 17-6709 (2006). In addition, the Master Plan of Consolidation provided that "the board of directors of Via Christi Medical Center, Inc. will include representatives of St. Joseph and St. Francis to insure the continuation of the existing commonalty of interest." Master Plan of

19

Consolidation, ROA, Vol. I, at 302. Ultimately, seven members of St. Joseph's old board became members of Via Christi's new board, as did six members of St. Francis' old board. A nominating committee, organized jointly by the sponsors of St. Joseph and St. Francis, nominated the remaining ten members of the twenty-three-person board. Three officers of St. Joseph continued in their same capacities as officers of Via Christi. One day after the consolidation, St. Joseph's sole member—CSJ—consolidated with St. Francis' sole member—St. Francis Ministry Corporation—to form Via Christi Health System, Inc. The two religious groups—the Sisters of St. Joseph and the Sisters of the Sorrowful Mother—remained as joint sponsors of Via Christi Health System, Inc.

*Procedural Background*

Via Christi submitted a Medicare cost report for the accounting year ending on September 30, 1995. According to the report, St. Joseph possessed assets with a total book value of $113.8 million, which included $29 million in current assets. Via Christi assumed St. Joseph's liabilities, which totaled $26.1 million, resulting in a total book loss to St. Joseph of slightly under $88 million. Of this $26.1 million in "consideration" that St. Joseph received for the consolidation (the assumed liabilities), St. Joseph assigned $12.1 million to its property, plant, and equipment. Of the $12.1 million, St. Joseph assigned $10.9 million to assets for which Medicare recognized depreciation. The Medicare book value of those assets was $47.7 million, resulting in a loss of $36.8 million on those assets alone. Via

20

Christi, the successor-in-interest to St. Joseph, sought reimbursement for Medicare's share of the loss, approximately $9.7 million. This $9.7 million is the sum at issue in the instant case.

Medicare's fiscal intermediary, Blue Cross, denied the claim because the transaction was "among related organizations." St. Joseph[10] sought review before the PRRB, arguing that Blue Cross disallowed its claim based upon Medicare policies developed after the consolidation. St. Joseph also contended that the alleged "continuity of control" by St. Joseph of the newly formed Via Christi was an inappropriate consideration under the Medicare regulations and policies in effect at the time, and even if it was an appropriate consideration, St. Joseph did not control Via Christi. Finally, St. Joseph argued that the "bona fide sale" requirement did not apply to consolidations, and even if it did, the parties to the consolidation had satisfied the requirement.

The PRRB concluded that the regulations required recognition of the loss. It held that the plain language of 42 C.F.R. § 413.134(*l*)(3) was "crystal clear that the related party concept will be applied to the entities that are consolidating," rather than the resulting entity. PRRB Decision, ROA, Vol. II, at 696. As additional support, the PRRB cited several of the written interpretations detailed supra, including the agency's comments in the Federal Register, interpretive

_____

[10] Via Christi is the successor-in-interest to St. Joseph and is the named Appellant in the instant case, but the PRRB and CMS Administrator referred to St. Joseph as the claimant. We will do likewise in an attempt to avoid confusion.

21

guidelines in the Medicare Intermediary Manual, and written interpretations from agency officials. The PRRB also found that the consolidation transaction was "bona fide" and that any attempt to impose additional requirements "is not supported by the plain meaning of the consolidation regulation and the Agency's own previous interpretation set forth in the manual instructions and informal written advice." Id. at 698.

The CMS Administrator reversed the PRRB. The Administrator held that the "related organization" concept appropriately included an inquiry into "continuity of control" between the consolidating entities and the new entity, and as support, the Administrator cited HCFA Ruling 80-4, Medical Center of Independence v. Harris, 628 F.2d 1113 (8th Cir. 1980), and PM A-00-76. CMS Decision, ROA, Vol. II, at 739-43. The Administrator also cited the Medicare Intermediary Manual, as well as GAAP Accounting Principles Bulletin No. 16, as support for not revaluing assets where a reorganization, or pooling, of assets has occurred, rather than a purchase of those assets by "new ownership." Id. at 743-45. The Administrator noted that a similar rule applies under IRS rules, where a consolidation that is, in effect, a reorganization results in non-recognition of gains and losses. Id. at 745-48.

The Administrator then found "that the transaction involved a related party transaction because of the relationship between [St. Joseph] and the consolidated hospital." Id. at 750. As support, the Administrator noted: (1) Sisters of St.

22

Joseph "was one of two voting members of the new parent corporation of the post-consolidation hospital"; (2) Sisters of St. Joseph "had 50 percent voting powers of the combined assets of two hospital[s], which the Administrator finds comparable to its pre-consolidation powers"; (3) a "significant number" of the members of St. Joseph's governing board "were appointed to the new governing board"; and (4) St. Joseph and its sponsor "retained and continued to have a significant control of its asset." Id. at 750-51. As a result, the Administrator found "compelling evidence on the relatedness of [St. Joseph] and the consolidated hospital," and concluded "that the parties were related according to 42 CFR § 413.17 and a loss on the disposal of assets cannot be recognized under Medicare." Id. at 752.

The Administrator also held that, before CMS would recognize a loss, the transaction must qualify as a "bona fide sale" under 42 C.F.R. § 413.134(f). Id. at 755. In this case, "the transfer of the assets did not constitute a bona fide sale and [St. Joseph] failed to met [sic] any other criteria under which a loss on the disposal of assets will be recognized at §413.134(f)." Id. The Administrator explained that "there is no evidence in the record of arm's length bargaining, nor an attempt to maximize any sale price as would be expected in an arms' length transaction." Id. In addition, the Administrator found that "the consideration received for the depreciable assets supports a finding that the transaction did not constitute a bona fide sale." Id.

23

The district court agreed with the reasoning of the CMS Administrator and affirmed the Secretary's decision.

## II.

On appeal, we review the decision of the district court de novo. St. Mark's Charities Liquidating Trust v. Shalala, 141 F.3d 978, 980 (10th Cir. 1998). As for the Secretary's decision, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, provides the applicable standard of review. See 42 U.S.C. § 1395oo(f).[11] "Under the APA, we may set aside agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" St. Mark's Charities Liquidating Trust, 141 F.3d at 980 (quoting 5 U.S.C. § 706(2)(A)). The APA "require[s] agencies, on pain of being found to have acted arbitrarily and capriciously, to comply with their own regulations." Cherokee Nation of Okla. v. Norton, 389 F.3d 1074, 1078 (10th Cir. 2004) (citations, internal quotation marks, and alterations omitted). Also, under the APA, 5 U.S.C. § 706(2)(E), we will set aside an agency action "unless it is

_____

[11] The Medicare statute contains some additional language regarding the promulgation and effect of rules and policy statements, see 42 U.S.C. § 1395hh(a), but courts generally interpret it to impose "no standards greater than those established by the APA." Baptist Health v. Thompson, 458 F.3d 768, 776 n.8 (8th Cir. 2006).

Further, St. Joseph's reliance on the Small Business Regulatory Enforcement Fairness Act ("Congressional Review Act") of 1996, 5 U.S.C. §§ 801-808 (2006), is misplaced. The Congressional Review Act specifically precludes judicial review of an agency's compliance with its terms. 5 U.S.C. § 805 ("No determination, finding, action, or omission under this chapter shall be subject to judicial review.").

supported by 'substantial evidence' in the administrative record." Pennaco

Energy, Inc. v. U.S. Dep't of the Interior, 377 F.3d 1147, 1156 (10th Cir. 2004).

In this context, "substantial evidence" is "something more than a mere scintilla

but something less than the weight of the evidence." Id. (citation and internal

quotation marks omitted).

"Different types of agency pronouncements are entitled to different degrees

of deference." Newton v. FAA, 457 F.3d 1133, 1136 (10th Cir. 2006). In

reviewing the validity of an agency regulation interpreting a statute, courts rely

upon the familiar two-step framework announced in Chevron, U.S.A., Inc. v.

Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under this

framework, unless a regulation contravenes "the unambiguously expressed intent

of Congress," id. at 843, "we ordinarily defer to an agency's interpretation of an

ambiguous statute that it implements," Newton, 457 F.3d at 1136. In contrast,

statutory "[i]nterpretations such as those in opinion letters—like interpretations

contained in policy statements, agency manuals, and enforcement guidelines, all

of which lack the force of law—do not warrant Chevron-style deference."

Christensen v. Harris County, 529 U.S. 576, 587 (2000). Such interpretations

"are 'entitled to respect' . . . , but only to the extent that those interpretations

have the 'power to persuade.'" Id. (quoting Skidmore v. Swift & Co., 323 U.S.

134, 140 (1944)).

Informal interpretations, however, do merit deference where they interpret

25

an ambiguous regulation.  Id. at 588; Newton, 457 F.3d at 1137 (holding that, insofar as an agency handbook is interpreting the statute "it is entitled to deference to the extent it is persuasive, and it is entitled to great deference insofar as it is interpreting the agency's own regulations" (citations omitted)).  As the Supreme Court has explained,

> [w]e must give substantial deference to an agency's interpretation of its own regulations.  Our task is not to decide which among several competing interpretations best serves the regulatory purpose.  Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.  In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.  This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (citations and internal quotation marks omitted).

### The "Related Parties" Inquiry

The first issue is whether the Secretary properly applied the "continuity of control" doctrine to conclude that the parties to the consolidation were "related" under 42 C.F.R. § 413.134(*l*)(3).[12]  Although this is a close issue, we conclude

---

[12] As a preliminary matter, the district court correctly concluded that 42 C.F.R. § 413.134(*l*) applies in the non-profit context, notwithstanding the title of the provision—"Transactions involving a provider's capital stock."  The Secretary
<span style="float:right">(continued...)</span>

26

that the "plain language" of the regulations precludes the Secretary's interpretation.

"We must . . . be careful not to disrupt the plain language of the regulation itself." Utah Envtl. Cong. v. Bosworth, 443 F.3d 732, 743 (10th Cir. 2006). Generally, "[w]e afford an agency's interpretation of its own regulations substantial deference, except in those instances where such interpretation is unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." Id. at 746 (citations and internal quotation marks omitted). Here, § 413.134(*l*)(3)(ii) prohibits revaluation of provider assets "[i]f the consolidation is between two or more related corporations (as specified in § 413.17)." The plain language of this provision, as well as the plain language of § 413.134(*l*)(3)(i), indicates that the "related parties" inquiry of § 413.134(*l*)(3) focuses solely on whether the parties to the consolidation were related prior to the transaction—not on whether they were related to the newly created entity. Where the plain language of a regulation is clear, "[w]e cannot torture the language to reach the result the agency wishes." Aspenwood Inv. Co. v. Martinez, 355 F.3d 1256, 1261 (10th Cir. 2004) (citation and internal quotation marks omitted). The agency, after all, "could easily have drafted language to achieve the result which it now

---

[12](...continued)
has always interpreted the regulation as applying to non-profits, see supra, and given the dearth of any other provisions applying in the non-profit context, such an interpretation is reasonable. St. Joseph does not contest this interpretation.

advocates but did not do so."  Id.  If the Secretary wants to take a position that is inconsistent with existing regulations, then the Secretary must promulgate new regulations under the notice-and-comment provisions of the APA, 5 U.S.C. § 553. Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 (1995).

Moreover, § 413.134(*l*)(3)'s plain language comports with the Secretary's intent at the time of the section's promulgation.  For instance, in 1979, when first promulgating the regulation, the Secretary explained that "assets may be revalued if two or more unrelated corporations consolidate to form a new corporation, but revaluation is not allowed if related corporations consolidate."  44 Fed. Reg. at 6,913.  Also, the 1987 Medicare Intermediary Manual, the 1987 Letter from William Goeller, and the 1994 Letter from Charles Booth all contained this same interpretation.  As the Supreme Court explained in Thomas Jefferson University, 512 U.S. at 512, "we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Here, both the "plain language" and the "indications of the Secretary's intent at the time of the regulation's promulgation" preclude the Secretary's current interpretation of § 413.134(*l*)(3).  St. Francis and St. Joseph were unrelated parties prior to the consolidation, and under the plain language of § 413.134(*l*)(3), the Secretary's "related party" determination was arbitrary and capricious and unsupported by substantial evidence.

28

We recognize that the district court reached the opposite conclusion, as did the Eastern District of Pennsylvania—the only other district court to consider this question expressly. See Jeanes Hosp. v. Leavitt, 453 F. Supp. 2d 888, 899 (E.D. Pa. 2006) ("While the plain meaning of § 413.134, if read in a vacuum, may seemingly limit the related-party analysis to the transacting parties, in fact, § 413.17 is incorporated with, and must be read in conjunction with, § 413.134. Thus, the Court finds the Administrator's interpretation of the regulation reasonable."). Like the PRRB, however, we refuse to "torture the language to reach the result the agency wishes." Aspenwood Inv. Co., 355 F.3d at 1261.

The Secretary cannot save his interpretation by reference to 42 C.F.R. § 413.17. Sections 413.134(*l*)(3)(i) and 413.134(*l*)(3)(ii) do refer to § 413.17, but only for clarification as to when the two consolidating corporations are related. See § 413.134(*l*)(3)(ii) ("If the consolidation is between two or more related corporations (as specified in § 413.17), no revaluation of provider assets is permitted."). Section 413.17 is certainly relevant, but under the plain language of § 413.134(*l*)(3), it does not stretch as far as the Secretary contends.

The Secretary also cites two sources from the 1980s as support for his "continuity of control" interpretation: HCFA Ruling 80-4 and Medical Center of Independence v. Harris, 628 F.2d 1113 (8th Cir. 1980). These authorities involved on-going lease and management arrangements between two entities, where the two entities became related after they signed the initial contract.

29

Neither of them addressed consolidations, and the Secretary's reliance upon them appears unfounded. Likewise, although Monsour Medical Center v. Heckler, 806 F.2d 1185, 1194 (3d Cir. 1986) provides some support for analyzing "control" both before and after a transaction, the court in Monsour was not addressing a consolidation or the regulations at issue. Especially in light of his early interpretive materials, the Secretary's claim that the agency has consistently addressed consolidations under a "continuity of control" standard is questionable at best—even if the Secretary has arguably applied something similar in other contexts. In any event, the "plain language" of the regulations, as well as the "indications of the Secretary's intent at the time of the regulation's promulgation," Thomas Jefferson Univ., 512 U.S. at 512, preclude the Secretary's current "continuity of control" interpretation.

*The "Bona Fide Sale" Requirement*

We agree with the Secretary that, in order for consolidating Medicare providers to obtain reimbursement for a depreciation adjustment, the consolidation must meet the "bona fide sale" requirements of 42 C.F.R. § 413.134(f). As with the "related parties" determination, the Secretary's interpretation of the regulations here is "controlling . . . unless it is plainly erroneous or inconsistent with the regulation," and we must defer to it "unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation."

30

Thomas Jefferson Univ., 512 U.S. at 512 (citations and internal quotation marks omitted).

The "bona fide sale" requirement is a reasonable construction of 42 C.F.R. § 413.134(*l*)(3)(i), supported by the text of the regulations. Section 413.134(f) is the only section expressly permitting depreciation adjustments and defining the exact circumstances under which a provider can seek such an adjustment. Several other sections refer to it directly for this purpose. For instance, § 413.130 alludes to § 413.134(f) for determining any depreciation adjustments under the regulations: "Capital-related costs and an allowance for return on equity are limited to the following: (1) Net depreciation expense as determined under §§ 413.134, 413.144, and 413.149, adjusted by gains and losses realized from the disposal of depreciable assets under § 413.134(f)." 42 C.F.R. § 413.130(a) (emphasis added). Likewise, § 413.134(*l*)(2)(i) references § 413.134(f) as "concerning recovery of accelerated depreciation and the realization of gains and losses" in the statutory merger context. If the Secretary is going to construe § 413.134(*l*)(3)(i) as permitting depreciation adjustments for consolidations,[13] then

_____

[13] As the district court noted, the Secretary could have interpreted the plain language of 42 C.F.R. § 413.134(*l*) as precluding any adjustment to depreciation payments for providers that consolidate. For statutory mergers between unrelated parties, § 413.134(*l*)(2)(i) provides that "the merged corporation . . . is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses." For consolidations between unrelated parties, however, § 413.134(*l*)(3)(i) contains no such reference to § 413.134(f). As the district court explained, "[u]nder the

(continued...)

31

the Secretary is perfectly reasonable in maintaining consistency and only allowing depreciation adjustments that comply with § 413.134(f). St. Joseph's construction, in contrast, would make depreciation adjustments easier for providers attempting consolidations than for providers undergoing asset sales or statutory mergers—a strange result, to say the least.

Compliance with § 413.134(f) is also consistent with interpretive materials that the Secretary issued both before and after the consolidation in the instant case. For instance, the 1987 Letter from William Goeller stated that, in the nonprofit consolidation context, "an adjustment to recognize any gain or loss to the merged/consolidated corporations would be required <u>in accordance with regulations section 42 CFR 413.134(f)</u>. . . ." 1987 Letter from William Goeller (emphasis added). Other interpretive materials likewise refer to § 413.134(f) explicitly. <u>See</u> 1994 Letter from Charles Booth; PM A-00-76.

Of the disposals of depreciable assets listed in § 413.134(f), the only one that would apply here is the "bona fide sale" of § 413.134(f)(2), and the Secretary has reasonably interpreted it as applying in this case. The Secretary originally

_____

[13](...continued)
maxim of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another), and the principle that related provisions of a statute are to be construed together, this absence might well be construed to mean that loss may be recognized in a merger but not in a consolidation." Dist. Ct. Op., ROA, Vol. I, at 57. Nevertheless, the district court is correct that "the Secretary has construed the provision to authorize the realization of gains and losses in qualifying consolidations," and that such a construction is reasonable. <u>Id.</u> Neither party contests this conclusion.

provided for depreciation adjustments under § 413.134(f) because the yearly "reasonable cost" depreciation reimbursements only approximated economic reality. See 44 Fed. Reg. at 3,980. In theory, at least, a "bona fide sale" under § 413.134(f) provided an objective measurement of an asset's worth, allowing both the Secretary and the provider to calculate the actual depreciation incurred to that point—and meriting an adjustment to previous depreciation payments. See id. Even if a consolidation or statutory merger is not a "sale" per se, treating it as a sale pursuant to § 413.134(f)(2) ensures that any depreciation adjustment will represent economic reality, rather than mere "paper losses."[14]

Additionally, the Secretary's definition of a "bona fide sale" in this context is reasonable and entitled to deference. See Thomas Jefferson Univ., 512 U.S. at 512 ("[T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." (citations and internal quotation marks omitted)). In the instant case, the Secretary explained that a "bona fide sale" includes (1) "arm's length bargaining, [including] an attempt to maximize any sale price," and (2) reasonable consideration. CMS Decision,

[14] If, as the Secretary argues, any depreciation adjustment under § 413.134(l)(3)(i) must occur pursuant to § 413.134(f), and if, as St. Joseph argues, the "bona fide sale" requirement is inapplicable to consolidations because they are not "sales," then St. Joseph automatically loses, because a consolidation would satisfy none of the other provisions of § 413.134(f) permitting a depreciation adjustment. The Secretary, however, is willing to allow depreciation adjustments in at least some consolidations, and the treatment of consolidations in the same vein as "sales" under § 413.134(f) is a reasonable way to accomplish that.

33

ROA, Vol. II, at 755-56.  This definition is consistent with the regulations and early interpretive materials.  See 42 C.F.R. § 413.134(b)(2) (defining "fair market value" as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition," and explaining that "[u]sually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition"); Jan. 11, 1989,  Memorandum; see also N. Iowa Med. Ctr. v. Dep't of Health & Human Servs., 196 F. Supp. 2d 784, 787 (N.D. Iowa 2002) ("Under 42 C.F.R. § 413.134(f), a sale of depreciable assets is bona fide if (a) fair market value is paid for the assets, and (b) the sale is negotiated (i) at arms' length (ii) between unrelated parties.").[15]  Even if the Secretary further clarified the definition of "bona fide sale" in interpretive materials issued after the consolidation in this case, e.g., PM A-00-76; CHOW Workgroup P.R.M.

_____

[15] Interestingly, the United States District Court for the Northern District of Iowa included a detailed "related parties" inquiry in its determination of whether a "bona fide sale" had occurred.  N. Iowa Med. Ctr., 196 F. Supp. 2d at 787, 788-94.  The common understanding of a "bona fide sale" would, it seems, naturally include such an inquiry, and perhaps the Secretary's "continuity of control" theory could be relevant in analyzing whether a "bona fide sale" has occurred in a given situation.  On several occasions, moreover, the Secretary has indicated that the "bona fide sale" requirement includes a "related parties" inquiry.  See, e.g., PM A-00-76; CHOW Workgroup P.R.M. Draft; Jan. 11, 1989,  Memorandum.  In the instant case, however, the Secretary chose to argue its "continuity of control" theory under §§ 413.134(l)(3) and 413.17, rather than as part of the "bona fide sale" discussion under § 413.134(f).  "Agency action must be upheld, if at all, on the basis the agency articulated." Cherokee Nation of Okla., 389 F.3d at 1078 (emphasis omitted).  Therefore, we decline to address the "related party" inquiry as part of the "bona fide sale" determination in this case.

Draft, St. Joseph was on notice that § 413.134(f) and its "bona fide sale" requirement would be more than a nullity.

Finally, substantial evidence justified the Secretary's finding that no "bona fide sale" occurred here. This was not an arm's length transaction. St. Joseph admitted that it was not attempting to get the full value for its assets, but rather its primary goal was to make a decision that would advance its ministry. The principals of St. Joseph did not approach any other entity about a consolidation, and they rejected the idea of putting St. Joseph up for sale because of their desire to perpetuate Catholic health care ministry in the community. Substantial evidence thus supported the Secretary's conclusion that "there is no evidence in the record of arm's length bargaining, nor an attempt to maximize any sale price as would be expected in an arms' length transaction." CMS Decision, ROA, Vol. II, at 755.

Further, reasonable consideration was notably absent from the transaction, and the economic case for revaluing the depreciable assets was highly questionable. Cf. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978) (holding, in the taxation context, that the doctrine of "substance over form" requires the Court to "look[] to the objective economic realities of a transaction rather than to the particular form the parties employed"). In the "bona fide sale" context, the reasonable consideration inquiry involves determining whether the provider received fair market value for its assets. See Jeanes Hosp., 453 F. Supp.

35

2d at 903; N. Iowa Med. Ctr., 196 F. Supp. 2d at 787; PM A-00-76, at 3 ("[I]n evaluating whether a bona fide sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis."). In the instant case, neither St. Joseph nor the Secretary conducted an appraisal of the assets' fair market value, and there has been some suggestion that we should remand for such a determination. See, e.g., Jeanes Hosp., 453 F. Supp. 2d at 904 (remanding "to the Administrator for further fact finding or similar proceedings . . . on whether the Jeanes Hospital merger was a bona fide sale"). We decline to do so in this case, for two reasons.

First, St. Joseph had the burden of showing that the transaction fit within § 413.134(f)'s "bona fide sale" provision. See Mercy Home Health v. Leavitt, 436 F.3d 370, 380 (10th Cir. 2006) ("The governing statutes and regulations indicate that the burden of proof remains on the provider. . . . With regard to reimbursement generally, the statute itself prohibits payment 'unless [the provider] has furnished such information as the Secretary may request in order to determine the amounts due such provider' for the particular cost period at issue." (quoting 42 U.S.C. § 1395g(a)) (second alteration in original)). As early as the PRRB Hearing, St. Joseph contended that even if the "bona fide sale" requirement applied, the consolidation nonetheless qualified as a "bona fide sale." See PRRB Decision, ROA, Vol. II, at 692. Despite this contention, St. Joseph never

36

provided any evidence of the assets' fair market value.

Second, no evidence suggests that a remand would change the result in this case. Even assuming the book value of St. Joseph's depreciable assets did not equal their fair market value, St. Joseph's cash and cash equivalents were $3.7 million, with total current assets at $29 million. As noted, the consideration for the transaction (Via Christi's assumption of St. Joseph's liabilities) was only $26.1 million.[16] Absent some record evidence to suggest that the current assets were impaired or worth significantly less, it seems purely speculative to remand to determine why St. Joseph would have sold its current assets at a material discount and its depreciable Medicare assets for nothing. As PM A-00-76 explains, "the sales price (assumed liabilities) is allocated first to the cash, cash equivalents, and other current assets," so in situations where the current assets are worth more than the assumed liabilities, "effectively the current assets have been

_____

[16] St. Joseph attempts to argue that this $26.1 million understates the consideration in this case because Via Christi assumed other contingent liabilities of uncertain value. St. Joseph, however, did not believe that the risk from these contingent liabilities was high enough to list them on its GAAP-compliant Balance Sheet, ROA, Vol. I, at 329. See Accounting for Contingencies, Statement of Financial Accounting Standards No. 5, ¶ 8 (Fin. Accounting Standards Bd. 1975), available at http://www.fasb.org/pdf/fas5.pdf (requiring an entity to record a contingent liability on its balance sheet and income statement—and not just in the footnotes of the financial statements—if it is both "probable" and "can be reasonably estimated"). Further, the consolidating parties' due diligence before the consolidation revealed that the risk from these contingent liabilities was acceptably low. See PRRB Hearing, at 545-46. St. Joseph cannot now make a mountain out of what it previously determined to be a molehill.

sold, and the fixed assets have been given over at minimal or no cost." PM A-00-76, at 4 (Example 3). In such a situation, "[b]ecause no part of the purchase price was allocated to the fixed assets, a <u>bona fide</u> sale of those assets has not occurred and Medicare would not recognize a loss as a result of the transaction." <u>Id.</u> Regardless of the fair market value of St. Joseph's depreciable assets, the consolidation at issue did not involve the reasonable consideration that a "bona fide sale" would produce, and St. Joseph is not entitled to Medicare reimbursement for a depreciation adjustment.

Affirmed.